# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP1258 |
| COMPLETE TITLE: | Golden Sands Dairy LLC,<br>        Plaintiff-Respondent-Petitioner,<br>Ellis Industries Saratoga, LLC,<br>        Plaintiff,<br>     v.<br>Town of Saratoga, Terry A. Rickaby, Douglas Passineau, Patty Heeg, John Frank and Dan Forbes,<br>        Defendants-Appellants,<br>Rural Mutual Insurance Company,<br>        Intervenor. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 375 Wis. 2d 797, 899 N.W.2d 737
(2017 – unpublished)

| | |
|---|---|
| OPINION FILED: | June 5, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 11, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Wood |
| JUDGE: | Thomas B. Eagon |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | ABRAHAMSON, J. joined by BRADLEY, A. W., J. dissent (Opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs filed by *Jordan J. Hemaidan*, *Daniel A. O'Callaghan*, *Joseph D. Brydges*, and *Michael Best & Friedrich LLP*, Madison, with whom on the briefs were *Brian G. Formella* and *Anderson, O'Brien, Bertz, Skrenes & Golla*, Stevens Point. There was an oral argument by *Jordan J. Hemaidan.*

For the defendants-appellants, there was a brief filed by *Remzy D. Bitar* and *Arenz, Molter, Macy, Rifle & Larson SC*, Waukesha, with whom on the brief was *Paul G. Kent* and *Stafford Rosenbaum LLP*, Madison. There was an oral argument by *Remzy D. Bitar.*

An amicus curiae brief was filed on behalf of the State of Wisconsin by *Sopen B. Shah*, deputy solicitor general, with whom on the brief were *Brad D. Schimel*, attorney general, and *Ryan J. Walsh*, chief deputy solicitor general. There was an oral argument by *Sopen B. Shah.*

An amicus curiae brief was filed on behalf of Agriculture Coalition by *H. Dale Peterson*, *John J. Laubmeier*, and *Stroud, Willink & Howard, LLC*, Madison.

An amicus curiae brief was filed on behalf of Wisconsin Counties Association by *Andrew T. Phillips*, *Rebecca J. Roeker*, and *Von Briesen & Roper, S.C.*, Milwaukee.

An amicus curiae brief was filed on behalf of Wisconsin Towns Association by *Richard Manthe* and *Wisconsin Towns Association*, Shawano.

An amicus curiae brief was filed on behalf of Wisconsin Municipalities by *Daniel M. Olson* and *League of Wisconsin Municipalities*, Madison.

An amicus curiae brief was filed on behalf of Local Business Amici by *Christa O. Westerberg*, *Leslie A. Freehill*, and *Pines Bach LLP*, Madison.

An amicus curiae brief was filed on behalf of Wisconsin Realtors Association, Wisconsin Builders Association, Wisconsin

2

Manufacturers and Commerce, and NAIOP-WI by *Thomas D. Larson* and *Wisconsin REALTORS Association*, *Wisconsin Builders Association*, *Wisconsin Manufacturers and Commerce* and *NAIOP-WI*, Madison.

**2018 WI 61**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2015AP1258
(L.C. No. 2012CV389)

STATE OF WISCONSIN      :      IN SUPREME COURT

**Golden Sands Dairy LLC,**

      **Plaintiff-Respondent-Petitioner,**

**Ellis Industries Saratoga, LLC,**

      **Plaintiff,**

  **v.**

**Town of Saratoga, Terry A. Rickaby, Douglas Passineau, Patty Heeg, John Frank and Dan Forbes,**

      **Defendants-Appellants,**

**Rural Mutual Insurance Company,**

      **Intervenor.**

**FILED**

**JUN 5, 2018**

Sheila T. Reiff
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 MICHAEL J. GABLEMAN, J. Wisconsin has long provided a vested right to build a structure upon the filing of a building permit application that strictly conforms to all applicable zoning regulations (the "Building Permit Rule")——a doctrine we reaffirmed last term in McKee Family I, LLC v. City

of Fitchburg, 2017 WI 34, 374 Wis. 2d 487, 893 N.W.2d 12. Golden Sands Dairy, LLC ("Golden Sands"), either owns outright (or is under contract to purchase) what collectively amounts to 6,388 acres in and around the Town of Saratoga ("Saratoga")[1] on which it seeks to operate a farm using the "farming full circle" model.[2]  Golden Sands obtained a building permit for seven farm structures.  Its building permit application identified the building site as 100 acres and the total farm as 6,388 acres. Further, Golden Sands included a map with its original building permit application that identified the precise land it would use for its farm and the location of the seven structures.

¶2  After Golden Sands filed its building permit application, Saratoga enacted its zoning ordinance that sought to prohibit agricultural uses such as those proposed by Golden

---

[1] The record reveals that some of the 6,388 acres may be located outside Saratoga's zoning jurisdiction.  The dispute before us concerns only that portion of Golden Sands' land within Saratoga's zoning jurisdiction.  Accordingly, our decision is limited to those portions of the 6,388 acres that are subject to Saratoga's zoning jurisdiction.  For simplicity's sake, we use "the Property" to describe those portions of the 6,388 acres that are:  (1) specifically identified in the map attached to the original building permit application; and (2) within Saratoga's zoning jurisdiction.

[2] Golden Sands' planned farm has two components.  First, a dairy operation will raise cattle for milk production.  Second, a cropland operation will grow feed for the dairy cattle and food for human consumption.  The cropland will be fertilized with manure from the dairy operation.  Hence, the "full circle" occurs when crops are fed to the cattle and manure from the cattle is used to fertilize crops that will again become (in part) cattle feed.

Sands. Golden Sands argues that the Building Permit Rule extends to all land specifically identified in a building permit application. Under its proposed modification of the Building Permit Rule, Golden Sands would have a vested right to use all of the Property for agricultural purposes. Saratoga disagrees, arguing that Golden Sands' building permit is limited to vesting its right to build the seven structures identified in the building permit.

¶3  The issue in this case is one of first impression in Wisconsin: does the Building Permit Rule extend to land identified in the building permit application as part of the project upon which no actual construction was planned? The Wood County Circuit Court[3] concluded that the Building Permit Rule does extend to all land identified in the building permit application, and consequently granted Golden Sands' motion for summary judgment. The court of appeals, however, reversed, holding that the Building Permit Rule applies only to building structures, and not to use of land. Golden Sands Dairy, LLC v. Town of Saratoga, No. 2015AP1258, unpublished slip op. (Wis. Ct. App. April 13, 2017) (Golden Sands II).[4]

---

[3] The Honorable Thomas B. Eagon presiding.

[4] We refer to the court of appeals' decision in this case as Golden Sands II because the court of appeals decided, in a prior case, whether Golden Sands' building permit application was sufficient such that Golden Sands was entitled to a writ of mandamus ordering Saratoga to issue the building permit. See infra ¶10.

¶4 We hold that the Building Permit Rule extends to all land specifically identified[5] in a building permit application. Consequently, Golden Sands has a vested right to use all of the Property for agricultural purposes.[6] Therefore, we reverse the decision of the court of appeals.

I. FACTS AND PROCEDURAL POSTURE

A. Golden Sands' Building Permit Application

¶5 Golden Sands filed its original building permit application with Saratoga on June 6, 2012. The application sought a permit to build seven structures on 92 acres. Attached to the application was a map that shaded the parcels to be used

---

[5] By "specifically identified," we mean that the building permit application, including attachments, must include a means to objectively determine the exact parcels of land at issue. A legal description is preferable, but a map that objectively identifies the parcels at issue will also suffice.

[6] To be (perhaps painfully) clear, our holding that Golden Sands possesses a vested right to use the Property for agricultural purposes is grounded upon its building permit dispute with Saratoga and therefore does not (and cannot) grant Golden Sands a vested right to use the Property for agricultural purposes if Golden Sands is unable to obtain an ownership interest in any piece of the Property.

for the dairy structures in yellow and the parcels to be used as farmland in blue.[7]

¶6 Golden Sands included with the Application copies of applications for various state permits required to operate the farm. Golden Sands was not required to provide copies of the state permit applications to receive a building permit from Saratoga, but rather did so as a "courtesy." These state permit applications provided even greater detail as to Golden Sands' plans for its farming operation.

## B. Applicable Zoning Regulations

¶7 At the time Golden Sands filed its initial building permit application (June 6, 2012), Saratoga did not have any zoning ordinances. The only land use restriction in place was Wood County's zoning ordinance, which zoned the land as "unrestricted," meaning the land at issue could be used for any lawful purpose.

¶8 Saratoga started the process to regulate land use within its borders in 2007, when it began to assemble a comprehensive plan pursuant to Wis. Stat. § 66.1001(2) (2011-

---

[7] Golden Sands filed an amended application on July 17, 2012. This amended application identified the "Area Involved" as "100 acres of site and 6,388 acres total." Attached to the amended application was a legal description of the 100 acres (which the circuit court subsequently found in actuality added up to 92 acres). The parties treat the amended application as supplementing the original application rather than superseding it, and so do we. We therefore refer to all application materials——the original application, the amended application, and all attachments thereto——collectively as "the Application."

12).[8] After completing a comprehensive plan, the next step for Saratoga was enacting a zoning ordinance. However, towns do not possess zoning powers by default under Wisconsin law. See Wis. Stat. §§ 60.22, 61.34(1). Instead, a town must receive village powers from its electors[9] pursuant to Wis. Stat. § 60.22(3) before it may exercise zoning powers. Saratoga's electors granted it village powers on September 24, 2012.

¶9 On July 19, 2012, during the time Saratoga was in the process of obtaining village powers, it passed a moratorium on issuing any building permit that was inconsistent with then-existing land use. This was two days after Golden Sands filed its amended building permit application.

¶10 Upon receiving village powers, Saratoga passed a permanent zoning ordinance on October 17, 2012, which the Wood County Board ratified on November 13, 2012, and the Saratoga Town Board ratified the next day. Under the permanent zoning ordinance, only two percent of the town——and none of Golden Sands' land——is zoned for agricultural use. Therefore, Golden

---

[8] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated. We cite to the 2011-12 version of the statutes because the events underlying this case occurred in 2012. The 2007-08 and 2011-12 versions of Wis. Stat. § 66.1001(2) are substantively identical. Compare § 66.1001(2) (2007-08) with § 66.1001(2) (2011-12).

[9] Electors are "[e]very U.S. citizen age 18 or older who has resided in an election district or ward for 28 consecutive days before any election where the citizen offers to vote." Wis. Stat. § 6.02(1).

6

Sands' planned operation does not conform to the zoning scheme enacted by Saratoga.

## C. The Mandamus Action

¶11 Saratoga provided two reasons for its refusal to issue the building permit requested by Golden Sands: (1) the moratorium on building permits enacted on July 19, 2012, prohibited issuance of the permit; and (2) Saratoga deemed the Application incomplete. Golden Sands then filed a mandamus action to compel Saratoga to issue the building permit. The circuit court concluded that the Application was complete and complied with all zoning regulations in place at the time it was filed, and thus granted the writ of mandamus. In response, Saratoga issued the building permit to Golden Sands. The court of appeals affirmed. Golden Sands Dairy, LLC v. Fuehrer, No. 2013AP1468, unpublished slip op. (Wis. Ct. App. July 24, 2014) (Golden Sands I). Saratoga did not file a petition for review from Golden Sands I, and thus the mandamus action is not subject to our review.

## D. The Present Action

¶12 Two weeks after filing the mandamus action, Golden Sands filed the present declaratory judgment action, asking the circuit court to declare that Golden Sands may use all the land specifically identified in the Application for agricultural purposes. The circuit court found that Golden Sands sufficiently identified the parcels that it intended to use for farming in the Application. Thus, the circuit court concluded that Golden Sands had a vested right to use the land

7

specifically identified in the Application for agricultural purposes and granted Golden Sands' motion for summary judgment. The circuit court added that Golden Sands' vested right to use the land for agricultural purposes expires at the same time the building permit expires.

¶13 The court of appeals reversed. Golden Sands II, unpublished slip op., ¶2. The court of appeals distinguished between the right to build a structure and the right to use land. Id., ¶14. It determined that the right to build a structure vests with the filing of a building permit application that strictly conforms to all applicable zoning regulations, but the right to use land vests with open and obvious use under the nonconforming use doctrine. Id. Based on this distinction, the court of appeals concluded that Golden Sands' building permit vested its right to build the structures, but not to use the other land identified in the building permit application for agricultural purposes. The court of appeals concluded that because Golden Sands had not established a nonconforming use before Saratoga's zoning ordinance took effect, it could not use any of its land for agricultural purposes. Id., ¶27.

¶14 The court of appeals articulated a series of concerns with Golden Sands' proposed modification of the Building Permit Rule. It did so in a series of questions:

- "[H]ow many of the identified 6[,]388 acres are needed?"

8

- "Why should all 6[,]388 acres obtain nonconforming use status simply because that amount of land was noted in the application?"

- "What if a factual inquiry would show that Golden Sands needs substantially fewer than 6[,]388 acres to fully utilize its proposed farm buildings?"

Id., ¶24.

¶15 Golden Sands petitioned this court for review, which we granted on September 12, 2017.

## II. STANDARD OF REVIEW

¶16 We review decisions granting summary judgment de novo. McKee, 374 Wis. 2d 487, ¶27. Summary judgment is proper where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Id.

## III. ANALYSIS

¶17 Our analysis begins[10] with a brief recitation of the Building Permit Rule. We then consider whether the Building

---

[10] We pause to clearly articulate the scope of our review. Since the events underlying this dispute occurred, the legislature enacted a statute that would govern the facts underlying this case, Wis. Stat. § 66.10015 (2013-14). However, because § 66.10015 (2013-14) applies prospectively, see 2013 Wis. Act. 74, § 2, it does not apply to this case—something the parties do not dispute. Despite acknowledging that § 66.10015 (2013-14) does not apply to this case, the parties, and many amici, nonetheless spend significant space in their briefs arguing how this case would be decided under the statute. To be clear, we do not interpret, apply, or analyze § 66.10015 (2013-14) in this decision. Furthermore, our resolution of this case under the common law should not be read to intimate how courts should apply § 66.10015 (2013-14).

Permit Rule extends to land specifically identified in the building permit application. Finally, we apply the Building Permit Rule to the facts of this case. We conclude that the policies underlying the Building Permit Rule extend to any land specifically identified in the building permit application as part of the project. Consequently, Golden Sands possesses a vested right to use the Property for agricultural purposes, consistent with the zoning regulations in place at the time Golden Sands filed the Application.

A.  The Building Permit Rule

¶18 Wisconsin is among the minority of United States jurisdictions that adheres to the Building Permit Rule, a bright-line rule vesting the right to use property consistent with current zoning at the time a building permit application that strictly conforms to all applicable zoning regulations is filed. Patricia E. Salkin, American Law of Zoning § 32:3, at 32-13——32-14 (2017).

¶19 In contrast, the rule adopted in the majority of jurisdictions requires both a building permit and "substantial construction and/or substantial expenditures before rights vest." Id. at 32-6. This means that, under this rule, a landowner's building permit can be revoked if the property is rezoned——even if construction has already begun. Folsom Invest., Inc. v. Scottsdale, 620 F. Supp. 1372, 1376 (D. Ariz. 1985). Courts applying the majority rule look for "substantial money expenditures, considerable contractual commitments, and extensive preparation[s]" to determine whether a landowner has

10

vested rights to complete construction.  Id.  This determination requires extensive fact-intensive litigation.  Cribbin v. City of Chicago, 893 N.E.2d 1016, 1031 (Ill. App. 2008) ("substantiality is a necessarily fact-intensive determination").  What constitutes "substantial" can vary from case to case.  See Prince George's Cty. v. Sunrise Dev. Ltd. P'shp, 623 A.2d 1296, 1298, 1304-05 (Md. Ct. App. 1993) (finding $2,000,000 in expenditures insufficient to vest rights in current zoning where construction was limited to pouring a footing).

¶20  In a unanimous opinion affirming the court of appeals and agreeing with the circuit court, we reaffirmed our adherence to the minority, bright-line Building Permit Rule last term in McKee, 374 Wis. 2d 487, ¶40.

¶21 The Building Permit Rule is an exception to the general policy that "[p]roperty owners obtain no vested rights in a particular type of zoning solely through reliance on the zoning."  Zealy v. City of Waukesha, 201 Wis. 2d 365, 381, 548 N.W.2d 528 (1996).  The court of appeals based its analysis, in large part, on the nonconforming use doctrine.  Golden Sands II, unpublished slip op., ¶14.  The nonconforming use doctrine is implicated when lawful uses of land are made unlawful by a change in zoning regulations.  Des Jardin v. Greenfield, 262 Wis. 43, 47-48, 53 N.W.2d 784 (1952).  However, under the nonconforming use doctrine, the landowner is allowed to continue using the land in the now-nonconforming fashion.  Id.  Neither

11

party has argued, nor do we conclude, that the nonconforming use doctrine is implicated in the case at bar.[11]

¶22 The Building Permit Rule grants the right to add or change a structure "when a property owner has applied for a building permit conforming to the original zoning classification." McKee, 374 Wis. 2d 487, ¶37 (citing Lake Bluff Hous. Partners v. City of S. Milwaukee, 197 Wis. 2d 157, 182, 540 N.W.2d 189 (1995)). Wisconsin adheres to this bright-line rule "because it creates predictability for land owners, purchasers, developers, municipalities[,] and the courts" by "balanc[ing] a municipality's need to regulate land use with a land owner's interest in developing property under an existing zoning classification." Id., ¶43.

¶23 The parties agree that the Building Permit Rule as stated in McKee is and should remain the law of Wisconsin. Accordingly, the parties also agree that Golden Sands possesses a vested right to build the seven structures as described in its building permit application. The parties dispute the full scope of the rule; that is, whether the Building Permit Rule also grants Golden Sands the right to use the farmland specifically identified in the building permit application for agricultural purposes. We turn next to consideration of this question.

---

[11] For a larger discussion of the nonconforming use doctrine, see Patricia E. Salkin, American Law of Zoning ch. 12 (2017).

B.   The Building Permit Rule Applies to All Land Specifically
Identified in the Building Permit Application.

¶24   In ascertaining the full scope of the Building Permit
Rule, we are guided by the policies underlying the rule.   The
primary advantage of the bright-line Building Permit Rule is
"predictability for land owners, purchasers, developers,
municipalities[,] and the courts."   McKee, 374 Wis. 2d 487, ¶43.
The rule adopted by a majority of American jurisdictions
requires "substantial construction and/or substantial
expenditures" even after receiving a building permit in order
for rights to vest.   Salkin, American Law of Zoning § 32:3, at
32-6.   We rejected the majority rule because the bright-line
Building Permit Rule allows all parties involved to know exactly
when rights vest:   "[M]unicipalit[ies have] the flexibility to
regulate land use through zoning up until the point when a
developer obtains[12] a building permit.   Once a building permit
has been obtained, a developer may make expenditures in reliance
on a zoning classification."   McKee, 374 Wis. 2d 487, ¶43.   The

---

¶12 Though McKee sometimes speaks in terms of "obtaining" a
building permit, submitting a building permit application that
strictly conforms to all applicable zoning regulations is all
that is necessary to trigger the Building Permit Rule.   McKee,
374 Wis. 2d 487, ¶37 (emphasis added) ("The [Building Permit
Rule] arises when a property owner has applied for a building
permit conforming to the original zoning classification.");
Lake Bluff Hous. Partners v. City of S. Milwaukee, 197
Wis. 2d 157, 182, 540 N.W.2d 189 (1995) (emphasis added) ("Lake
Bluff obtained no vested rights[] because it never submitted an
application for a building permit conforming to the zoning and
building code requirements in effect at the time of the
application.").

bright-line Building Permit Rule is simple for parties to interpret and courts to apply. Conversely, the majority rule requires fact-intensive litigation and "create[s] uncertainty at various stages of the development process." Id., ¶¶44-45.

¶25 The court of appeals and Saratoga would disassociate the right to build structures under the Building Permit Rule from the right to use the land associated with the permit. We respond to this by noting that over 30 years ago, the court of appeals aptly described the problem with parsing out parts of a business for land use purposes:

> Such 'piecemealing' of [the defendant's] activities is unrealistic in that it overlooks the true nature of the services he was providing. In fact, [the defendant's] business consisted of various small marina and resort related activities which, in combination, assisted the business's survival and gave the enterprise its true resort and marina flavor. This synergistic action of [the defendant's] business activities vested his interest in their continuance.

Waukesha Cty. v. Seitz, 140 Wis. 2d 111, 116, 409 N.W.2d 403 (Ct. App. 1987). While Seitz involved the nonconforming use exception, the principle it articulates is equally applicable to the Building Permit Rule because both achieve the same end——protecting vested rights based on reasonable expectations. See McKee, 374 Wis. 2d 487, ¶42; Des Jardin, 262 Wis. at 47-48.

14

¶26 We conclude that the primary policy[13] underlying the bright-line Building Permit Rule——predictability——is best advanced by applying the rule to all land specifically identified in the building permit application. Such a rule ensures that all parties know when rights vest in what land: the time a building permit application that strictly complies with all applicable zoning regulations is filed. This rule promotes judicial economy and ensures that "developer[s] may make expenditures in reliance on a zoning classification." McKee, 374 Wis. 2d 487, ¶43.

¶27 The "piecemealing" advanced by the court of appeals and Saratoga would require extensive litigation over how much land specifically identified in the building permit application is necessary, which neutralizes one of the primary reasons we adhere to the Building Permit Rule: avoiding lengthy, fact-intensive litigation. See id., ¶44. Further, for any business that requires land in addition to structures for its operations, a building permit is nearly worthless if the rights vested by virtue of obtaining a conforming building permit do not extend to the land necessary to put the structures to their proper use.

---

[13] Considerations of policy are entirely appropriate when developing common-law doctrines. Progressive N. Ins. Co. v. Romanshek, 2005 WI 67, ¶63, 281 Wis. 2d 300, 697 N.W.2d 417 ("[T]his court may mold and develop common-law doctrines to best effectuate the purpose for which they were designed . . . ."); Scarpaci v. Milwaukee Cty., 96 Wis. 2d 663, 682, 292 N.W.2d 816 (1980) ("The doctrine of immunity of municipal officers from civil liability also evolved in the common law of this state. [It] was developed on grounds of public policy . . . .").

¶28 The court of appeals asked a number of questions raising some concerns about the amount of land Golden Sands was going to use. These concerns, for purposes of the Building Permit Rule, are irrelevant to our analysis and provide a showcase as to one way the purpose of avoiding fact-intensive litigation is served by this bright-line rule. As personally "curious" or "concerned" members of the court of appeals may be as to how much land will actually be utilized by Golden Sands, and for what purpose the utilization is to be had, there simply is no legal relevance to their inquiry. Therefore, the purpose of the bright-line rule is served when judges focus their inquiry on that which is legally relevant, and avoid that which is not. In the case at bar, the court of appeals' concerns are particularly unfounded because the circuit court held that Golden Sands' vested rights in the land expire when the building permit expires. Thus, if Golden Sands overestimated the amount of land it needs to operate the farm, the land not in use at the time the building permit expires would not benefit from either the Building Permit Rule or the nonconforming use doctrine, and any future use would simply have to conform with Saratoga's zoning ordinances.

¶29 The parties do not direct us to, nor did our research reveal, any cases from other jurisdictions that have considered this issue.[14] However, we are able to utilize principles from

---

[14] Saratoga cites two decisions from other jurisdictions for the proposition that the rights vested by building permits do not extend to associated lands, but both are distinguishable.

(continued)

16

other jurisdictions that adhere to the Building Permit Rule in order to aid our analysis. Those jurisdictions emphasize that the rights vested by a building permit application are to develop the land, not merely build structures. For example, the Building Permit Rule has been interpreted so that it "is well settled that a landowner has a vested right to <u>develop land</u> under the zoning ordinances in effect at the time the permit application is submitted." <u>Manna Funding, LLC v. Kittitas Cty.</u>, 295 P.3d 1197, ¶28 (Wash. Ct. App. 2013) (emphasis added). Other courts have underscored the idea that, in the building permit context, use of the land follows use of the buildings. For example, "Georgia courts have concluded that property rights

---

In <u>Deer Creek Developers, LLC v. Spokane Cty.</u>, the plaintiff obtained a site plan for a two-phase residential development, but obtained building permits for only the first phase. 236 P.3d 906, ¶6 (Wash. Ct. App. 2010). After construction began on the first phase, the applicable zoning law was changed such that residential uses were prohibited in the area. The court, applying the Building Permit Rule, held that the developer did not have vested rights to build the second phase because no building permit application was filed for the second phase. <u>Id.</u>, ¶¶29-30. Conversely, in the present matter, Golden Sands specifically identified the entire project acreage in the Application.

In <u>Huff v. Des Moines</u>, the plaintiff obtained a building permit to construct a trailer park, but never obtained the necessary permit to operate a trailer park. 56 N.W.2d 54, 55-56 (Iowa 1952). The court held that the plaintiff did not possess a vested right to operate the trailer park. <u>Id.</u> at 95. <u>Huff</u> is inapposite because the issue here is not whether Golden Sands possesses a vested right to permits necessary to operate its farm. Rather, the issue before us is whether Golden Sands possesses a vested right to use the Property for agricultural purposes.

17

vest when a permit is actually issued for a particular land use and that a later, new zoning ordinance prohibiting that land use is not enforceable against the property owner." Crown Media, LLC v. Gwinnett Cty., 380 F.3d 1317, 1325 (11th Cir. 2004) (emphasis added); see also WMM Props., Inc. v. Cobb Cty., 339 S.E.2d 252, 254 (Ga. 1986) (emphasis added) ("Once a building permit has issued, a landowner has a right to develop the property pursuant to that permit . . . ."). These opinions bolster our understanding that the proper scope of the Building Permit Rule includes the land, not merely the structures.

C. Application of the Building Permit Rule to Golden Sands.

¶30 We first address a threshold issue, Golden Sands' ownership of the land. "The vendee under a contract to purchase land is the equitable owner and is the 'owner' for many purposes. We think that the vendee is an owner for the purpose of applying for a building permit . . . ." Sheer v. Weis, 13 Wis. 2d 406, 413, 108 N.W.2d 523 (1961) (footnote omitted). Though we cited only a single case in support of the proposition in Sheer, we have applied the doctrine in multiple circumstances. Id. at 413 n.2 (citing Mueller v. Novelty Dye Works, 273 Wis. 501, 78 N.W. 881 (1956) (holding that creditor holding judgment against seller could not execute against property titled in seller's name because land was subject to valid contract to purchase)); Ritchie v. Green Bay, 215 Wis. 433, 437, 254 N.W. 113 (1934) (tax exemption); Menominee River Lumber Co. v. Philbrook, 78 wis. 142, 146, 47 N.W. 188 (1890) (ejectment action).

18

¶31 Golden Sands specifically identified the Property in the Application. The map attached to the original application provides an objective means to determine the specific land Golden Sands intends to use in order to build structures as well as cultivate, seed, fertilize, harvest, and otherwise maintain the land it will use for agricultural purposes. The map highlights the Property in blue (agricultural land) and yellow (land on which the structures are to be built). The map is based on a U.S. Geological Survey topographical map that contains details, such as county borders, roads, and latitude and longitude, that allow a person to objectively determine the borders of the shaded land. Because the map provides an objective means to determine the contours of the Property and was attached to a building permit application that strictly conformed to all applicable zoning regulations, Golden Sands possesses a vested right to use the Property for agricultural purposes.

¶32 Golden Sands' situation demonstrates how predictability is best served by vesting rights to all land specifically identified in a building permit application. Agriculture is the starkest example of a business that requires substantial land in addition to structures in order to operate. If Golden Sands' building permit served only to guarantee Golden Sands' right to build the structures for the dairy farm, the permit would be worthless because Golden Sands needs the agricultural land in order to make the farm work.

19

¶33 To separate structures from their associated land would be to allow zoning authorities to circumvent the Building Permit Rule by enacting restrictive zoning regulations on land that is necessary to give the buildings value. Saratoga argues that Golden Sands is required to establish a nonconforming use in order to continue using its land for agricultural purposes. Under Saratoga's reasoning, Golden Sands could not be certain that its dairy would be allowed to operate until sometime after operations had actually commenced and sometime after Golden Sands had actually invested significant sums of additional money. This is so because the nonconforming use doctrine applies only after the land use begins. This uncertain result is exactly what the bright-line Building Permit Rule attempts to avoid. McKee, 374 Wis. 2d 487, ¶43 ("Once a building permit has been obtained, a developer may make expenditures in reliance on a zoning classification."). Saratoga and the court of appeals would ignore that the "synergistic action of [Golden Sands'] business activities vested [its] interest in their continuance." Seitz, 140 Wis. 2d at 116.

## IV. CONCLUSION

¶34 We hold that the Building Permit Rule extends to all land specifically identified in a building permit application. Consequently, Golden Sands has a vested right to use the Property for agricultural purposes.

*By the Court.*—The decision of the court of appeals is reversed.

¶35 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* Today, the majority expands the Building Permit Rule to create vested rights to particular uses of land so long as the land is "specifically identified" in the building permit application.[1]

¶36 This ill-advised expansion of the Building Permit Rule sacrifices the important public policies that the Building Permit Rule was designed to encourage, namely, "predictability for land owners, purchasers, developers, municipalities, and the courts."[2]

¶37 The majority's expansion of the Building Permit Rule transforms what was once an easy-to-apply, bright-line rule into a rule requiring a case-by-case analysis of the applicant's specificity regarding both the description of the property included within the scope of the building permit application as well as the property's proposed use.

¶38 Accordingly, I dissent.

I

¶39 In the majority of jurisdictions, a building permit can be revoked if the property is rezoned after the permit is issued even if construction has already begun.

¶40 In these jurisdictions, in addition to applying for and obtaining the building permit, land owners and developers must have incurred substantial expenditures or construction must

---

[1] Majority op., ¶4.

[2] McKee Family I, LLC v. City of Fitchburg, 2017 WI 34, ¶43, 374 Wis. 2d 487, 893 N.W.2d 12.

already be substantially underway in order for the land owners or developers to acquire the right to construct the proposed building despite the building's non-compliance with the new or amended zoning ordinance.[3]

¶41 In contrast, Wisconsin is among the minority of jurisdictions that recognize a vested right to construct a building when the land owner submits a building permit application that strictly conforms to all applicable zoning ordinances in effect at the time the application is submitted.[4] This doctrine is referred to as the Building Permit Rule.

¶42 Just last term, this court reaffirmed Wisconsin's adherence to the Building Permit Rule and explained the important policies that the rule promoted. The court stated:

> Wisconsin applies the bright-line building permit rule because it creates predictability for land owners, purchasers, developers, municipalities and the courts. See, e.g., Guertin v. Harbour Assurance Co. of Bermuda, 141 Wis. 2d 622, 634-35, 415 N.W.2d 831 (1987) (explaining that bright line rules provide predictability and protect all parties). It balances a municipality's need to regulate land use with a land owner's interest in developing property under an existing zoning classification. A municipality has the flexibility to regulate land use through zoning up until the point when a developer obtains a building permit. Once a building permit has been obtained, a developer may make expenditures in reliance on a zoning classification.

---

[3] 4 Patricia E. Salkin, American Law of Zoning § 32:3, at 32-6 (5th ed. 2017).

[4] McKee, 374 Wis. 2d 487, ¶37.

<u>McKee Family I, LLC v. City of Fitchburg</u>, 2017 WI 34, ¶43, 374 Wis. 2d 487, 893 N.W.2d 12.[5]

¶43 Underlying the Building Permit Rule is the notion that land owners and developers are proceeding on the basis of a reasonable expectation.[6] That is, submitting a building permit application that conforms to the zoning or building code requirements in effect at the time of the application gives rise to the reasonable expectation that construction can proceed and expenditures can be made in reliance on the then-applicable zoning classification.[7]

II

¶44 In the instant case, the majority expands the Building Permit Rule to create vested rights to particular uses of land so long as the land is "specifically identified" in the building permit application.

---

[5] Although the quoted language from <u>McKee</u> speaks of "obtaining" a building permit, the holding of <u>McKee</u> is that the land owner's right to construct a proposed building vests when the land owner "has <u>submitted an application</u> for a building permit that conforms to the zoning or building code requirements in effect at the time of application." <u>McKee</u>, 374 Wis. 2d 487, ¶4.

[6] <u>McKee</u>, 374 Wis. 2d 487, ¶42.

[7] At the time Golden Sands submitted its building permit application, the land at issue was enrolled in the DNR's Managed Forest Land program, which precluded agricultural uses, and Golden Sands was aware of the Town's efforts to rezone the land.

One wonders how reasonable Golden Sands' expectations were given what it knew at the time it submitted its building permit application.

¶45 The majority's expansion of the Building Permit Rule creates uncertainty in a previously predictable process in at least two ways.

¶46 First, the majority announces that a particular use of land will be protected under the Building Permit Rule so long as the land is "specifically identified" in the building permit application. While acknowledging that "[a] legal description is preferable," the majority says that a map may suffice as well.[8]

¶47 The majority explains why the map submitted with Golden Sands' building permit application is sufficiently detailed to objectively identify the relevant land.[9] Even accepting that proposition as true, the outcomes of future cases remain uncertain. At what point will a map lack sufficient detail to "specifically identify" the land at issue? Simply asking this question indicates that the majority has injected uncertainty into the application of the Building Permit Rule where it did not previously exist.

¶48 In my view, requiring (as opposed to preferring) a legal description of the lands included in the building permit would eliminate this uncertainty, but it would also compel a ruling against Golden Sands because Golden Sands submitted in

---

[8] Majority op., ¶4 n.5. Golden Sands is fortunate that the majority is satisfied with a map, because Golden Sands did not provide a legal description of the total acreage it intended for use for its farming operation. Instead, the only legal description provided by Golden Sands was the legal description of the land upon which the proposed buildings would be constructed.

[9] Majority op., ¶31.

its building permit application a legal description of only the land upon which the proposed buildings would be constructed.

¶49 Second, and perhaps more importantly, how specific must the building permit application be with regard to the proposed use of the land specifically identified in the application?

¶50 In the instant case, Golden Sands' building permit application did not include a great deal of detail about the overall proposal outside of the building site, and Golden Sands did not consult with the Town before filing its application.

¶51 The majority points out that the building permit application included copies of applications for various state permits required to operate the farm that described Golden Sands' proposed farming operation in greater detail. However, the majority acknowledges that "Golden Sands was not required to provide copies of the state permit applications to receive a building permit from [the Town], but rather did so as a 'courtesy.'"[10]

¶52 This acknowledgement raises an important but unanswered question: Would Golden Sands' application be sufficient under the majority's expanded Building Permit Rule without the inclusion of the "courtesy" materials submitted to the Town?

¶53 If the answer to this question is "no," that would seem to contradict the majority's conclusion that the "courtesy"

---

[10] Majority op., ¶6.

5

materials were not required in order to vest in Golden Sands the right to use the land as described in those "courtesy" materials.[11]

¶54 If the answer to this question is "yes," that would encourage land owners and developers to withhold from municipalities the specific details about how they intend to use the land. Creating an incentive to provide less rather than more detail in the application process frustrates the paramount policy goal advanced by the Building Permit Rule——providing predictability to all parties.

III

¶55 The majority has erroneously expanded the Building Permit Rule beyond its traditional scope. In doing so, it has undermined the rule's primary purpose of ensuring predictability in the development process for both developers and municipalities.

¶56 Because the majority's expansion of the Building Permit Rule undermines the rule's fundamental purpose, I dissent.

¶57 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

---

[11] See majority op., ¶6.